Filed 8/31/20; Certified for Publication 9/28/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GEORGE SIEG,<br><br>     Plaintiff and Appellant,<br><br>         v.<br><br>DAVID R. FOGT, as Registrar of<br>Contractors, etc., et al.,<br><br>     Defendants and Respondents. | A156089<br><br>(Sonoma County<br>Super. Ct. No. SCV-261304) |

George Sieg appeals from a judgment denying a petition for a writ of administrative mandamus by which he sought review of a disciplinary decision rendered against him by the Registrar of the California Contractors' State License Board (Registrar). Based on Sieg's improper installation of hardwood flooring in a client's home, which caused the client to incur considerable replacement and reinstallation expense, the Registrar found violations of Business and Professions Code[1] sections 7109, subdivision (a), and 7113, and ordered payment of restitution, a three-year term of probation, and imposition of a disciplinary bond requirement. We affirm.

---

[1] All statutory references are to the Business & Professions Code, unless otherwise specifically designated.

1

## I. Procedural Background

### A. *Administrative Proceedings*

An enforcement representative for the California Contractors' State License Board (CSLB) filed an Accusation seeking revocation or suspension of Sieg's contractor's license and restitution. The Accusation alleged that Sieg, who does business as a sole proprietor under the name B & G Hardwood Flooring, failed to follow spacing and fastening requirements when installing a hardwood floor, thus subjecting his license to discipline for departing from trade standards in violation of section 7109, subdivision (a), and for failing to complete a construction project for the agreed contract price in violation of section 7113. Sieg filed a Notice of Defense requesting an administrative hearing, and shortly thereafter filed a civil lawsuit against the homeowners involved.[2]

An Administrative Law Judge (ALJ) conducted an administrative hearing that was held over the course of two days. Following these two hearing days, the ALJ issued an order giving the CSLB an opportunity for a third day of hearing to put on a rebuttal case following the close of Sieg's case-in-chief. Due to the illness of Sieg's counsel, many months passed before that additional hearing day could take place. Eventually, the CSLB waived its right to present rebuttal evidence and sought leave to submit written closing argument. The ALJ granted its request, and the parties submitted written closing arguments.

The ALJ then issued a proposed decision recommending a 65-day suspension and a three-year probation term including payment of restitution in the amount of $27,884.21. The Registrar adopted the ALJ's proposed

---

[2] In an earlier unpublished opinion (*Sieg v. Torchia* (July 31, 2019, A152750)), we affirmed the dismissal of the complaint in that action, *Sieg v. Torchia* (Super. Ct. Sonoma County, 2019, No. SCV-258043).

decision but eliminated the 65-day suspension term and required Sieg to obtain a disciplinary bond of $30,000.00 under section 7071.8, effective for a period of three years.

B. *Administrative Mandamus Proceedings in Superior Court*

Sieg challenged the Registrar's decision in Superior Court by filing a petition for a writ of administrative mandamus under Code of Civil Procedure section 1094.5. Following the filing of an amended petition, the trial court heard argument and issued an order denying writ relief. This timely appeal is from the judgment entered on that order

## II. Evidence Adduced at the Hearing Before the ALJ

In mid-January 2012, Dennis Torchia (Torchia) and his wife Ana Torchia[3] purchased from Lumber Liquidators a floor covering product known as Brazilian Ebony hardwood for their home in Windsor, California. Torchia chose Brazilian Ebony, an exotic species of unusually hard wood, for its appearance and durability. Sales personnel at Lumber Liquidators estimated the wood would be delivered within three to four weeks.

For installation following delivery, Lumber Liquidators referred Torchia to its installation service department, Home Services Store (HSS), which in turn recommended Sieg to do the installation. Upon this recommendation, Torchia hired Sieg to install his new flooring. The initial meeting between contractor and client occurred January 23, 2012, when Sieg went to Torchia's home to take measurements and provide an estimate for labor. Torchia testified that, during this meeting, he does not recall Sieg advising him to install a plastic cover over the crawl space dirt below his

---

[3] Because all of the pertinent interactions with Sieg and his homeowner clients, the Torchias as a couple, appear to have taken place between Sieg and Dennis Torchia, we will generally refer only to Dennis Torchia in this opinion. We mean no disrespect in doing so.

3

home as a barrier against moisture intrusion, and he was given no instructions about doing anything to prepare for the installation.

Due to a product delivery delay well beyond the estimate Lumber Liquidators gave, several months passed between Sieg's initial meeting with Torchia in mid-January and the delivery of the wood, which pushed the start date for the installation project into early summer 2012. Sometime around June 16, 2012, the Brazilian Ebony wood arrived at Lumber Liquidators, and Sieg and his crew delivered it to Torchia's home a few days later. Sieg measured the moisture of the wood and informed Torchia that there was more than the allowed two points moisture difference between the existing subfloor and the new wood flooring, and therefore installation was scheduled for a week later, to allow time for the new wood to acclimate.[4]

The evidence was conflicting as to when a contract to begin the project was signed. The day after the initial meeting between Sieg and Torchia in January 2012, Sieg gave Torchia a work order proposal estimating the costs of the job and attaching a document entitled "Conditions" that states, in part, "6 mil black polyethylene is recommended to cover 100% of the crawl space earth." Torchia signed this document on June 25, 2012. At some point, Sieg also presented Torchia with a document entitled "Installation Order Form." The Installation Order Form, which bears a difficult-to-decipher set of initials dated January 23, 2012, on a line signifying "Customer Initials," has the word "Yes" written in after "MOISTURE BARRIER NEEDED," and includes language at the bottom of the form stating "[t]he above information has been explained to me in full by my installer, and I understand that the installer,

---

[4] "Points" in this context refers to moisture level as measured by a moisture meter. In in this case, the subfloor had more than two "points" of moisture compared to the Brazilian Ebony.

HSS and the HSS retailer are not responsible for any damage caused by post-installation changes in the moisture levels."

Torchia testified at the hearing that the manual dating and initialing as of January 23rd on the Installation Order Form was forged, that he did not sign it until after the wood arrived in June of 2012, and that he had no recollection of seeing it until then. Torchia acknowledged that, on June 25, 2015, in a conversation about starting the project, Sieg raised the need for a moisture barrier, but he claimed that that was the first time Sieg brought up the topic. Torchia also acknowledged a felt-sense of urgency to begin the work. Sieg wanted to wait a few more days so that the wood would have even more time to acclimate; he stated that he would proceed with the installation immediately, so long as Torchia signed a disclaimer and release of any claims for problems arising from installation without a moisture barrier. Torchia assented on June 28, 2012, signing a document presented to him by Sieg entitled HSS Installation Disclaimer and Release (the Disclaimer).

The Disclaimer states that installation of the floor was inadvisable because the "Prefinished flooring is over two points less than subfloor and no plastic covering the dirt under house." Torchia testified that he felt pressured to sign the Disclaimer because he would be unable to take time off work to oversee the installation if the project did not start as scheduled. Sieg, he testified, assured him that proceeding without a moisture barrier most likely would not cause any problems and that some wood never technically acclimates—in essence, that things would be "fine." According to Torchia, Sieg told him that, other than possibly putting the manufacturer's warranty at risk, he felt it was okay to proceed.

On June 29, 2012, Sieg and his workers began installation of the floor. The project took four days to complete. Within weeks of installation, Torchia noticed a "very loud popping sound, sounding like firecrackers going off in

5

different parts of the house." Later investigation of these problems by a flooring inspection expert hired by Lumber Liquidators, Richard King, revealed that, in addition to the fact that the flooring had been installed without a plastic liner under circumstances in which there was a moisture differential between the wood and the subfloor, there were problems with the workmanship, including the following: (1) The flooring was installed tight against the walls, with no expansion space provided. (2) Some areas of the flooring had no fasteners. (3) The flooring was generally fastened two to four inches from ends, further than the manufacturer-required one to three inches from ends. (4) The flooring fasteners were generally spaced eight to eleven inches apart, in some places more than twelve inches apart, further than the manufacturer-required six to eight inches apart. (5) Fasteners were driven through the sub-floor. (6) No underlayment was installed around registers and crawl space access.

King opined that these installation errors caused the problems Torchia was experiencing with his floor, and that Sieg's workmanship did not comply with accepted trade standards for good and workmanlike construction. The lack of proper fastening, in particular, created a situation unlike any King had ever come across in his decades of experience: "[W]hen you walk on the floor and it's not fastened properly, the floor moves, buckles, wiggles, makes noises. But with Mr. Torchia's floor . . . I could look into the alcove with nobody in there. And the floor continued to pop and make noises. It was like it was demonized. . . . [¶] I also saw visually from floor level gaps between the edges of the planks, I could see the tongue side of the board. And I found boards that had no fasteners in there, let alone not being spaced properly, which would indicate the reason why the floor moves and buckles." Sieg admitted he had not followed manufacturer instructions for edge spacing and fastener spacing.

Torchia testified that, upon reporting these problems to Sieg, Sieg was dismissive and unresponsive. Acting on his own, Torchia tried to take steps to rectify the issues he was experiencing, but the process of finding someone to assist was difficult, drawn out, and expensive. At a cost of about $7,000, sometime around April of 2013 Torchia had the crawl space encapsulated with a liner, a measure he took in an effort to reduce humidity and moisture. Even after putting in a moisture barrier, however, he continued to experience problems with the flooring.

In July of 2014, two years after installation of the floor, Torchia finally found another flooring contractor, Michael Roesner, to diagnose the problems and propose a remedial plan. Roesner provided a proposal to repair the floor by removing and reinstalling it. He testified at the hearing: "[I]t was evident when I walked in . . . there was already some noticeable things with the floor . . . [¶] buckling, tenting,[5] and some crackling noises as we were walking over it." Roesner opined that improper expansion space and improper fastening spaces contributed to the problems with the floor. His proposal for the labor to correct the installation did not include the cost of 35 percent of the wood that he estimated could not be salvaged and would have to be replaced. Based on Roesner's proposal and the price that the homeowner had paid for the wood, CSLB investigator Oather McClung, Jr. calculated that Torchia would have to pay approximately $27,884.21 above the contract price in order to have the project corrected.

As of the date of Torchia's testimony before the ALJ several years later, Torchia had not yet hired anyone to carry out the removal and reinstallation, but still hoped to have it done: "I had a difficult time finding someone who

---

[5] "Tenting" in hardwood flooring is a condition where the floorboards have raised edges.

would actually give me an estimate to repair it. . . . I finally found someone who would give me an estimate, and the estimate is actually more expensive than it was to install the first floor, including the product and the installation for costs. . . . [¶] I had hoped [to get it repaired] a long time ago, but obviously this has been a long, drawn out process." It had been more than three years since Torchia had the plastic liner installed over the crawl space, and not only had there been no improvement to the loud, cracking noises, but Torchia could also feel the flooring moving underneath his feet, and edges of some of the boards were still raised.

In response, Sieg pointed out that Roesner, whom Sieg characterized as "the only competent Bay Area flooring contractor to testify," had nothing negative to say about his workmanship. And by way of affirmative rebuttal to CSLB's case, he offered the expert testimony of another flooring contractor, John Karriker, who opined that the post-installation problems that developed with Torchia's flooring were a result of moisture vapor intrusion into the floors. Karriker disagreed with King's view that there were workmanship problems with the installation, such as incorrect placement of fasteners and inadequate perimeter expansion spacing.

Based on Karriker's testimony as well as his own, Sieg's defense centered on an argument that the sole problem with the installation of Torchia's flooring was moisture intrusion, which caused cupping in the hardwood boards. According to Sieg, Torchia brought that problem on himself. Pointing to Torchia's experience with releases in his job in the insurance industry, Sieg argued that Torchia was a sophisticated consumer who signed the Disclaimer knowing the risk of proceeding without a liner, yet he decided to do so anyway because any delay beyond June 2012 would have interfered with his vacation plans.

8

## III.  Decisions by the ALJ and by the Trial Court

The ALJ upheld the CSLB's Accusation in its entirety, finding the charges established by clear and convincing proof.  In his decision, the ALJ left no doubt whom he believed and whom he did not.  Making specific credibility findings in favor of Torchia, King, Roesner and McClung, and specific adverse credibility findings against Sieg and Karriker, the ALJ found that Torchia had been inadequately advised of the risks of installation without a plastic liner; that there were multiple workmanship problems with the installation in addition to the absence of a liner; and that the Disclaimer was void and unenforceable.  The ALJ also made specific findings that Sieg gave false and misleading information to CSLB's investigators, and that Sieg "refused to reasonably respond to the reasonable and earnest" complaints from Torchia or to make him financially whole.

The trial court, on review of the Registrar's decision adopting the ALJ's decision in modified form, ruled as follows.  First, the court sustained the CSLB's objections to evidence presented by Sieg on the ground that none of the proffered evidence was presented at the hearing before the ALJ.  In support of his request for mandamus relief, Sieg attempted to introduce a variety of evidence that had not been considered by the ALJ, including a September 2016 additional report by King as to the causes of the problems with Torchia's floor, and certain testimony given in the course of Sieg's lawsuit against the Torchias.  The court explained that it must base its decision in a mandamus review proceeding on the evidence that was made part of the administrative record.

Second, applying the independent judgment test under which factual findings supported by the administrative agency are affirmed if supported by the weight of the evidence, the court upheld the ALJ's determinations that Sieg committed numerous workmanship violations.  The court specifically

9

found King's testimony to have been credible. The court also took into account the favorable credibility determinations of the ALJ with respect to Roesner, McClung, and Torchia and the adverse credibility determinations with respect to Sieg and Karriker. Based on these findings, and in reliance on *Mickelson Concrete Co. v. Contractors' State License Board* (1979) 95 Cal.App.3d 631 (*Mickelson*), the court affirmed the CSLB's conclusions that Sieg willfully deviated from accepted standards for good and workmanlike construction and failed to complete a project he had contracted to undertake for the agreed contract price.

Third, the court rejected Sieg's defense based on the Disclaimer. The court concluded that "[t]he evidence from the record demonstrates that [Sieg] was in a superior position to the homeowner in understanding the proper steps and requirements when installing a floor"; that Sieg "had decades of experience and knowledge and was a licensed contractor"; and that "[t]he weight of the evidence established that [Sieg] failed to SUFFICIENTLY advise the homeowner that a plastic cover was needed in the crawl space." Based on these findings, the court affirmed the CSLB's conclusions that the Disclaimer was void as an invalid waiver of statutory standards of workmanship and unenforceable as an unconscionable contract.

Finally, the court rejected Sieg's contention that the manner in which the ALJ conducted the hearing violated his due process rights. As explained by the trial court, "the Administrative Law Judge took great care and extended significant efforts to ensure [Sieg] received a fair and complete hearing. The ALJ was patient and took steps to give all parties the opportunity to present their cases. This included ongoing opportunities for [Sieg] to provide evidence both in person and in writing. The ALJ was fair in taking into consideration the availability of [Sieg's] counsel while he addressed important health issues. The record establishes that the ALJ was

10

flexible on scheduling and reasonable in the manner in which he conducted the hearing."

## IV. Discussion

### A. *Standards of Review*

Upon review of an administrative decision in a professional licensing discipline proceeding by petition for a writ of mandamus under Code of Civil Procedure section 1094.5, the trial court looks at the entire administrative record and makes its own determination (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 811–812 *(Fukuda)*), applying what is known as the independent judgment test to both the facts and the law.  (*Ibid*.)  Under that test, the court will affirm agency findings of fact if they are supported by the weight of the evidence (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 51–52), but reviews questions of law de novo, giving respectful consideration to an agency's decision on legal questions to the extent its reasoning is persuasive.  (*Szold v. Medical Bd. of California* (2005) 127 Cal.App.4th 591, 596 & fn. 4, citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 (*Yamaha*).

In the trial court's assessment of facts on mandamus review, " 'independent judgment' review" does not mean " 'the preliminary work performed by the administrative board in sifting the evidence and in making its findings is wasted effort. . . . [I]n weighing the evidence the courts can and should be assisted by the findings of the board.  The findings of the board come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence.' " (*Fukuda, supra,* 20 Cal.4th at pp. 811–812, italics omitted.)

Then, in this court, on review of the trial court's decision in an administrative mandamus proceeding, "[o]rdinarily, we review the trial

11

court's ruling for substantial evidence (*Fukuda, supra,* [20 Cal.4th] at p. 824), but [as in the trial court] we review de novo rulings on questions of law such as interpretation of city charters and municipal codes" (*Szold*, at 596 & fn. 4; *Hall-Villareal v. City of Fresno* (2011) 196 Cal.App.4th 24, 29) and other matters resting on undisputed facts, giving deference under *Yamaha* to the degree the agency's decision is persuasive. (*Yamaha, supra,* 19 Cal.4th 1, 7–8.) Under this standard, our task in this case is to evaluate the entire record, interpreting the evidence in the light most favorable to the CSLB and drawing all reasonable inferences in its favor, as the CSLB was the prevailing party in the lower court. (*Diego v. City of Los Angeles* (2017) 15 Cal.App.5th 338, 349.) Sieg, as the appellant, bears the burden of affirmatively demonstrating error. (*Culbertson v. R. D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704.)

We cannot substitute our view of the evidence for that of the trial court. "So long as there is 'substantial evidence,' [we] must affirm, even if [we] would have ruled differently had [we] presided over the proceedings below, and even if other substantial evidence would have supported a different result." (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.) Substantial evidence means "evidence . . . 'of ponderable legal significance, [which is] reasonable in nature, credible, and of solid value.' " A single witness' testimony may be sufficient to satisfy the substantial evidence test. (*Mickelson*, *supra*, 95 Cal.App.3d at p. 634.) If more than one rational inference can be deduced from the facts, we may not replace the trial court's conclusions with our own. (*Tellis v. Contractors' State License Bd.* (2000) 79 Cal.App.4th 153, 158 (*Tellis*).)

Applying the foregoing principles of review, we conclude that Sieg has not borne his burden of demonstrating error. We are satisfied that the trial

court's factual findings are supported by substantial evidence and we see no error in its legal conclusions.

B. *Violation of Substandard Work (§ 7109, subd. (a)) and Failure To Complete Contracted Work at Agreed Price (§ 7113) Provisions of the Contractors' State License Law*

Chapter 9, Article 7 of the Contractors' State License Law (§ 7000 et seq.) governs contractor disciplinary actions against contractors. (*Tellis*, *supra*, 79 Cal.App.4th at p. 158.) Among the grounds for discipline under that chapter are those set forth in section 7109, subdivision (a), which applies to any "willful departure in any material respect from accepted trade standards for good and workmanlike construction . . . unless the departure was in accordance with plans and specifications prepared by or under the direct supervision of an architect[,]" and section 7113, which applies to any "[f]ailure in a material respect on the part of a licensee to complete any construction project or operation for the price stated in the contract for such construction project or operation or in any modification of such contract[.]"

The elements of a section 7109 violation are not identical to the elements of a section 7113 violation, and a violation of section 7109, subdivision (a) does not necessarily compel the conclusion there was a violation of section 7113. But where, factually—as in this case, given the persistent nature of Torchia's floor problems, and Sieg's failure to address them—it is alleged that "a contractor's failure to take corrective action to make an ostensibly completed construction project an acceptable one that met trade standards" (*Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 608), the violation of section of 7113 is tantamount to a lesser included offense within the broader ambit of section 7109, subdivision (a). Sieg does not argue otherwise. Our resolution of this appeal therefore turns on

13

whether facts and the law support the determination that Sieg violated section 7109, subdivision (a).

1. *Substantial Evidence Supports the Adjudicated Disciplinary Violations*

We conclude the evidence is sufficient to support the finding that Sieg willfully departed from accepted trade standards for good and workmanlike construction in violation of section 7109, subdivision (a), starting with the "buckling, tenting, and. . . crackling noises" observed by Roesner in 2014. To explain those conditions, King testified that, among other things, Sieg failed to leave adequate expansion space for the wood, failed to follow manufacturer and other requirements regarding fastening the wood, and failed to include an underlayment under the complete floor, and that these violations, at a minimum, contributed to the problems with the floor.

The workmanship deficiencies King identified in Sieg's installation included violation of the manufacturer's recommended standard for "exotic species," which required a consistent "nailing schedule" placing nails between six and eight inches apart. This failing was consistent with CSLB investigator McLung's observation that Sieg's lack of familiarity with such a rare wood made it all the more important that he strictly follow manufacturer instructions. There was also evidence that the problems with Sieg's installation persisted for years. According to Torchia, at the time of the hearing, three years after installation, even after he installed a plastic liner over the crawl space, the floor still moved when walked upon, had tented boards, and emitted loud, cracking noises at random.

We acknowledge that Sieg firmly disagrees. Emphasizing his 30-year discipline-free record as a contractor until this case arose, Sieg argues that the problems with the floor were not caused by the workmanship violations described above. He contends that what caused these problems was moisture

14

coming from the crawl space, which needed a plastic cover over the soil, as he repeatedly warned Torchia before the installation began. But this is nothing more than an effort to reargue the evidence on appeal. Sieg's contention that Torchia knowingly decided to proceed, having been advised of the risks of an installation without a moisture barrier, turns on the factual premise— presented by his expert, Karriker—that moisture intrusion was the sole cause of the problems Torchia later experienced. Resolving what was essentially a battle between experts, the ALJ decided this issue against Sieg, and the trial court upheld that decision, employing its independent judgment. We cannot revisit these matters here. What is dispositive, at this stage, is that the record contains substantial evidence to support Torchia's side of the dispute.

Sieg makes the fallback argument that there is insufficient evidence to support a finding that he acted willfully, a necessary component of discipline based on a departure from accepted trade standards under section 7109, subdivision (a). We are not persuaded. There is ample evidence to support a willfulness determination under the general intent standard of willful in section 7109. *Mickelson*, *supra*, 95 Cal. App. 3d at p. 635, cited by the trial court, makes clear that section 7109's willfulness requirement is satisfied by evidence of a general intent to act. " 'In civil cases, the word "willful," as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent.' " (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 12; see *Murrill v. State Board of Accountancy* (1950) 97 Cal.App.2d 709, 713; *Milner v. Fox* (1980) 102 Cal.App.3d 567, 573 fn. 9.)

15

2. *A Private Agreement To Dilute, Circumvent, or Release Away*
   *Statutorily Imposed Workmanship Standards Provides No Defense*
   *in Disciplinary Proceedings Under the Contractors' Licensing Law*

Sieg lays great emphasis upon the argument, made before the ALJ, made again in the trial court—and rejected both factually and legally at each stage—that in the Disclaimer Torchia released away any basis to complain about Sieg's having installed the flooring without a moisture barrier in place. He insists this case must be resolved for him as a matter of law by simply enforcing the Disclaimer according to its plain terms. We do not agree. Wholly aside from the fact that, here too, Sieg's contentions reprise his side of a credibility contest (this one over when and under what circumstances he provided notice to Torchia about the need for a barrier), he misses the fundamental point the trial court made with its capitalization of the word "SUFFICIENTLY" in its order denying writ relief. The issue here is not that Sieg failed to apprise Torchia of the risks of proceeding with a moisture barrier, orally and in writing—including in the Disclaimer. It is that Sieg, who was in a superior position of knowledge and expertise, failed to apprise Torchia adequately of the risks.

Legally, Sieg frames his Disclaimer argument on the premise that the error here is erroneous application of the unconscionability standard enunciated in *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83. As a statutory limitation on the enforceability of private contracts (Civ. Code § 1670.5), unconscionability requires a showing of both procedural and substantive unconscionability. (*Armendariz*, at p. 114.) Such a defense to enforcement of a contract may be defeated in circumstances where the consumer had genuine freedom of choice. (*Freeman v. Wal-Mart Stores, Inc.* (2003) 111 Cal.App.4th 660, 669–670.) Arguing that the *Armendariz* standard cannot be met on this record, Sieg highlights

16

Torchia's familiarity with releases and contends Torchia had options, but says "[i]t is clear that he wished to push forward with the project and was willing to assume any risks attendant [to it]." According to Sieg, the Torchias "insisted on the immediate installation convenient to their vacation schedule, ignoring or discounting the potential moisture issue warnings[.] [Sieg] was simply following the Torchias' insistence on doing things 'their way.'"

Here again Sieg misses what we view as the dispositive point. Both the ALJ and the trial court rejected Sieg's Disclaimer argument on two grounds, concluding that the Disclaimer is unenforceable as an illegal contract, quite apart from whether Torchia was a sophisticated consumer or had meaningful freedom of choice. We arrive at the same result, but on a slightly different ground than the ones the trial court and the ALJ articulated. Because this is not a private action between Sieg and Torchia, we see no need to address matters of unconscionability or contract illegality. Whether the Disclaimer was valid and enforceable as a contract is beside the point, since we are dealing with a disciplinary enforcement proceeding brought by CSLB on behalf of the public. For purposes of licensing enforcement, a homeowner cannot consent to a contractor's departure from accepted trade standards for good and workmanlike construction. (Civ. Code § 3513 [a law established for a public reason cannot be contravened by a private agreement].)

Whatever private arrangements may be made between a contractor and a client, the contractor has an independent obligation *to the public* to adhere to statutorily established standards of performance. (§ 7109, subd. (a); cf. *Mickelson*, *supra*, 95 Cal.App.3d at p. 635 [rejecting concrete contractor's attempt to defeat willfulness finding in section 7109 enforcement proceeding on the ground that "he informed both [clients] that a pour over was an improper method of repair, that he read [to the clients] the contents of the contract absolving himself of responsibility before proceeding with the

17

pour over"].)  We base this reading of section 7109, subdivision (a), on the text and legislative history of the statute.  As the CSLB correctly points out, the Legislature amended section 7109, subdivision (a), in 1988, to remove language which once made it possible for contractors facing discipline to defend accusations of departure from statutory trade standards by arguing client consent.  (§ 7109, as amended by Stats. 1988, ch. 1619, § 4.)  Thus, while the governing contract here established the benchmark for Sieg's obligations to Torchia, in discharging those obligations he was bound to adhere to statutorily imposed standards of workmanship that could not be diluted, circumvented, or released away by private consent.

C. *Sieg Was Afforded Due Process Protections*

Sieg's briefs are laced with florid innuendo suggesting that the Registrar's disciplinary process is somehow corrupt[6] and that the ALJ was biased against him.[7]  Despite the heated rhetoric, we discern few specifics and even less substance to these undifferentiated claims of procedural unfairness.  Sieg failed to present any such attacks on the integrity of the administrative process to the trial court—at least not in a sufficiently specific

---

[6] See e.g., AOB at p. 12 ("The Registrar, a political Appointee, has, like all bureaucratic Managers an agenda and constituency.  The Registrar is not and does not exercise a 'Judicial' function, it is prosecutorial.  And, not only does it enforce its own agenda when it wishes, it imposes the entire cost of enforcement on the on the [*sic*] unfortunate focus of its prosecution.  In Russia, the family of disfavored political figures similarly receives the bill for the cost of the executioner's bullet.")

[7] See AOB at p. 13 ("The Registrar has no ethical or internal institutional constraints.  That is, the Registrar does not take a Judicial Oath and may or may not even have any legal training.  [¶] . . . The Prosecution selects which OAH Hearing Officer will take the CSLB's evidence.  Here, Hon. Perry Johnson ALJ, selected by the prosecuting attorney CSLB attorney [*sic*] who[m] it is also undisputed, so warned Sieg's counsel, this ALJ had NEVER recommended contrary to her/CSLB desired result.")

way to preserve them for argument on appeal, framed as a basis for relief in his writ petition—and, as a result, his broad-sweeping claims of corruption and bias have been forfeited in this court. We therefore will not address them.

Beyond his generalized claims that the administrative process was stacked against him, we conclude that the specific complaints about procedural unfairness that Sieg did preserve for appellate review are meritless. Sieg complains, for example, of a series of "patently manifest" due process violations, chiefly "[t]he truncated time allowed [Sieg's] counsel at the hearing," which purportedly "precluded a thorough examination of the evidence." He also complains about having been given an inadequate opportunity to cross-examine witnesses and about an "obvious" attempt by the ALJ to "cure" an omission in the CSLB's proof by sua sponte inviting it to reopen its case after the second day of hearing, while at the same time rejecting Sieg's effort to add evidence after the second day of hearing.

On the basis of the record of the administrative proceedings, we reject Sieg's claims of fundamental unfairness. In a multi-day hearing Sieg had ample opportunity to call and examine witnesses. Not only did Sieg have the opportunity to cross-examine each of the CSLB's witnesses, he also had the opportunity to present witnesses of his own, and to testify on his own behalf. The CSLB was within its discretion to decline to receive additional evidence from Sieg after he rested his defense case at the end of the second day of the hearing. And after the hearing, Sieg exercised his right to submit written arguments, filing not one but two sets of written closings. Under the circumstances, the idea that he was not afforded sufficient opportunity to defend himself (*Petrus v. Department of Motor Vehicles* (2011) 194 Cal.App.4th 1240, 1245) is wholly unsustainable.

19

We also reject Sieg's claim of unfairness based on events that occurred after the two days of hearing before the ALJ. In support of his writ petition, Sieg asked that the trial court review evidence obtained after the final day of hearing. He proffered the post-hearing evidence that the ALJ had excluded: a post-hearing report prepared by King, as well as excerpts of testimony from the civil trial in Sieg's lawsuit against the Torchias. Sieg contended that these items of evidence contradicted or undermined testimony given by King and by Torchia at the administrative hearing. This effort to present additional, extra-record evidence was the subject of the initial evidentiary rulings in the trial court's order denying writ relief.

"As a general rule, a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency. Code of Civil Procedure section 1094.5, subdivision (e), however, allows the trial court to consider evidence not presented at the administrative hearing if the evidence addresses the petitioner's claim that he or she was denied due process or a fair hearing." (*Richardson v. City and County of San Francisco Police Com.* (2013) 214 Cal.App.4th 671, 702 (*Richardson*); see *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 735, [in opposition to respondent's writ petition in the superior court, agency submitted a declaration describing the agency's internal structure and operating procedures].) "But the trial court may only admit relevant evidence that, in the exercise of reasonable diligence, could not have been produced at the administrative hearing." (*Richardson, supra,* at p. 702.)

Sieg claims the post-hearing evidence he proffered was unavailable at the time of the hearing and was relevant to his due process claims. With regard to King, Sieg contends the exhibit admitted into evidence before the ALJ purportedly as King's expert "report" was not, in fact, a report authored

20

by King, but was instead a document prepared by the CSLB's investigator, McClung. According to Sieg, in September 2016, King prepared an actual report for McClung in which he opined that the cupping of the hardwood in Torchia's floor was caused by moisture problems—which is consistent with what Karriker opined. With respect to Torchia, Sieg claims there is now clear evidence of "perjury" by Torchia based on testimony given by Torchia in the course of Sieg's lawsuit against him and his wife (before it was dismissed) in which Torchia admitted to receiving Sieg's proposed contract in January 2012 and acknowledged his expectation that Sieg would proceed with the flooring installation in June 2012 in reliance on the Disclaimer.

We need not decide whether it was error to exclude any of this evidence under the *Richardson* standard, because even assuming it was, we think the error was harmless. To begin with, we have examined the September 2016 expert report prepared by King and we are not persuaded that it contradicts his testimony at the hearing before the ALJ. King never testified that moisture was *not* a cause of the cupping problems with Torchia's flooring; he testified it was among the causes. There is no reason to believe the outcome would have been any different had the ALJ considered Sieg's proffered post-hearing evidence or used it as the basis for reopening the evidence to allow further cross-examination of King. Moreover, even assuming Karriker was correct, factually, about moisture as the sole cause of the post-installation problems Torchia experienced, that was simply the predicate for the argument that Torchia released Sieg from any legal exposure by signing the Disclaimer. As we have explained, however, the Disclaimer argument fails because private agreements to depart from statutorily imposed workmanship standards provide no defense to an alleged violation of section 7109, subdivision (a), in disciplinary enforcement proceedings. The rejection of Sieg's attempt to introduce an admission from Torchia concerning his receipt

21

of other written warnings about proceeding with installation absent a moisture barrier is harmless for the same reason.

## Disposition

The judgment is affirmed.  Respondents to recover costs on appeal.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
TUCHER, J.

Filed 9/28/20

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GEORGE SIEG,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>DAVID R. FOGT, as Registrar of Contractors, etc., et al.,<br><br>    Defendants and Respondents. | A156089<br><br>(Sonoma County<br>Super. Ct. No. SCV-261304)<br><br>**ORDER GRANTING REQUEST TO CERTIFY OPINION FOR PUBLICATION** |

THE COURT:

The opinion in the above-entitled matter filed on August 31, 2020, was not certified for publication in the Official Reports. The Registrar of Contractors, California Contractors' State License Board filed a request that the opinion be published. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

Dated: September 28, 2020              POLLAK, P. J.

1

Trial Court:                          Sonoma County Superior Court

Trial Judge:                          Hon. Patrick M. Broderick

Counsel for plaintiff and             Robert A. Nellessen
appellant:

Counsel for defendants and            Xavier Becerra, Attorney General,
respondents:                          Linda Schneider, Sr. Asst. Attorney General,
                                      Diann Sokoloff, Supervising Deputy
                                      Attorney General, Aspasia A. Papavassiliou,
                                      Deputy Attorney General

A156089

2